Elmer Hornburg and Verna Hornburg, his wife [1] v. Commissioner. Hornburg v. Commissioner
Docket Nos. 89477, 89598, 89610, 90132, 95435, 112-62, 542-62, 587-62, 634-62, 782-62 - 784-62.
United States Tax Court
T.C. Memo 1963-95; 1963 Tax Ct. Memo LEXIS 249; 22 T.C.M. (CCH) 459; T.C.M. (RIA) 63095; April 2, 1963
Andrew F. Slaby, Esq., for the petitioners. Melvin E. Pearl, Esq., and Denis J. Conlon, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined the following deficiencies in petitioners' income tax and additions to tax for the years 1957 and 1958: Addition to Tax
Sec. 6653(a)
Docket No.
Petitioners
Year
Deficiency
I.R.C. 1954 [2]
89477
Elmer Hornburg and Verna Hornburg, his wife
1957
$105.27
$ 5.26
1958
123.92
6.20
89598
Edward E. Blenski and Janet Blenski, his wife
1958
68.76
3.44
89610
Edward E. Blenski
1957
130.73
6.54
90132
Robert De Meaux
1957
215.58
10.78
1958
197.42
9.87
95435
Martin Bines
1957
97.00
4.85
1958
97.00
4.85
112-62
Frank Gillman and Lenore Gillman, his wife
1957
92.52
4.63
1958
90.46
4.52
542-62
Anthony Maglio and Lorelda Maglio, his wife
1957
130.65
6.53
1958
142.05
7.10
587-62
Donald Doggett and Grace Doggett, his wife
1957
135.00
6.75
1958
81.00
4.05
634-62
Morris Singer and Rose Singer, his wife
1957
99.00
4.95
1958
88.68
4.43
782-62
Stanley Tetzlaff and Helen Tetzlaff, his wife
1957
110.15
5.50
1958
98.32
4.91
783-62
Edwin C. Ihlenfeld
1957
52.00
2.60
784-62
Edwin C. Ihlenfeld and Genevieve Ihlenfeld, his
wife
1958
52.80
2.64
*250 The issues in these cases are (1) the correctness of respondent's determination as to tip income received by petitioners in their occupations as cab drivers in 1957 and 1958 and (2) whether petitioners are liable for additions to tax under section 6653 (a) for the years 1957 and 1958. Findings of Fact Some of the facts were stipulated and they are so found. Petitioners are residents of Milwaukee, Wisconsin and they filed their Federal income tax returns for the years 1957 and 1958 with the district director of internal revenue, Milwaukee, Wisconsin. Hereinafter the term petitioners will refer only to the cab drivers and not to their wives. All of the petitioners, with the exception of Ihlenfeld, De Meaux and Maglio, were full-time cab drivers in the Milwaukee area for Checker Cab Company or the Boynton Cab Company (which operates Yellow Cab) during the years 1957 and 1958. Ihlenfeld was a part-time cab driver during these years and he also had a full-time job as a railroad maintenance worker. De Meaux was a full-time limousine driver (12 passengers) for the Boynton *251 Cab Company during these years. Maglio started as a cab driver in February 1957 and drove part time for about two months, then became a full-time driver. All of the petitioners were at least average drivers and generally showed the same courtesy and attention to their passengers. They operated in the same general geographical area although one or two of the petitioners concentrated on airport runs. Among the passengers of the petitioners in each of the years 1957 and 1958 were members of the clergy, nuns and elderly persons on social security. During each of the years 1957 and 1958 several of the petitioners took passengers to out-of-town destinations. All of the petitioners had a number of charge account passengers in both 1957 and 1958. In each of the years 1957 and 1958 the petitioners had a few passengers who, upon reaching their destination, left without paying their fares or were unable to pay. Charge account customers represented 1.9 percent of the total business of the Checker Cab Company in each of the years 1957 and 1958. Charge account business of the Boynton Cab Company represented 3.61 percent of its total business in 1957 and 2.59 percent of its total business in *252 1958. Gross fares, or the amount registered on the meters, of the petitioners in the course of their employment as taxi cab (or limousine) drivers during the years 1957 and 1958 were as follows: 1957
1958
Cab
Gross
Gross
Petitioner
Company
Fares
Fares
Hornburg
Checker
$6,234.01
$6,266.60
Blenski
Checker
5,566.13
3,358.16
De Meaux
Boynton
9,255.30
8,623.50
Bines
Boynton
5,201.35
5,308.70
Gillman
Boynton
8,942.80
8,434.65
Maglio
Checker
6,681.76
8,089.38
Doggett
Boynton
7,355.95
4,799.20
Singer
Boynton
5,910.70
5,355.20
Tetzlaff
Boynton
6,160.50
5,645.55
Ihlenfeld
Boynton
3,436.70
3,425.30
None of the petitioners kept books or written records indicating the amount of tip income received by them in the years 1957 and 1958. Petitioners reported the following amounts of tip income for 1957 and 1958: Petitioner
1957
1958
Hornburg
$150.00
$ 95.75
Blenski
100.00
100.00
De Meaux
30.00
None
Bines
None
None
Gillman
449.60
428.67
Maglio
None
None
Doggett
None
None
Singer
105.00
103.00
Tetzlaff
100.00
100.00
Ihlenfeld
None
None
Respondent made a survey of tipping *253 habits in the Milwaukee area with regard to cab drivers in the years 1957 and 1958, and as a result of such survey determined that the tipping custom for passengers in that area was to tip on the average 10 percent of the gross fare. Respondent, in the statutory notices of deficiency, determined the tip income of each petitioner in 1957 and 1958 as follows: Petitioner
1957
1958
Hornburg
$623.40
$639.10
Blenski
556.60
347.24
De Meaux
972.00
924.00
Bines
516.40
524.34
Gillman
899.23
857.34
Maglio
668.17
800.43
Doggett
738.80
478.20
Singer
619.00
542.00
Tetzlaff
656.59
596.53
Ihlenfeld
260.00
264.00
Opinion In the absence of any books or records to show the tip income received by petitioners in 1957 and 1958 the respondent, under the authority of section 446, computed each petitioner's tips for those years on the basis of a method which, in respondent's opinion, clearly reflected such tip income. [3] It is established that tips or gratuities constitute compensation for services rendered and are includable in gross income under section 61(a). , affirmed, . Respondent's *254 determination is presumptively correct and each petitioner has the burden of proving the incorrectness or unreasonableness of such determination. Respondent argues an average tipping rate of 10 percent of gross fares is reasonable. [4] There was evidence of a survey conducted by him of tipping practices of cab passengers in the Milwaukee area that would support the reasonableness of such a formula. Among other sources, respondent contacted several large corporations in the area to ascertain the tipping habits of their personnel and also introduced other evidence at the trial in support of the 10 percent figure. We must reject, therefore, the petitioners' contention on brief that the formula used by respondent was arbitrary or without rational foundation. *255 Petitioners also attack the 10 percent figure as excessive. They all testified they experienced run-outs (passengers leaving without paying fares); that they had members of the clergy, nuns and social security recipients among their passengers who either did not tip or from whom no tips were accepted; that they had charge customers who rarely tipped, and that they had out-of-town passengers who, as a rule, did not tip. The testimony on these categories of passengers and their tipping habits was vague and unpersuasive. As to run-outs, some of the petitioners testified that these were few in number, others testified as to amounts ranging from $5 to $20 in each year; one petitioner testified that he had three run-outs in 1957 and was not sure as to 1958, and one petitioner testified that he had a "couple" in 1957, and, in 1958, "I guess I had one." As to clergy, nuns, and social security recipients, the testimony was that, as a whole, this group represented anywhere from 2 percent to 50 percent of gross fares. Apart from the mere self-serving assertions by petitioners as to these percentages, there is nothing in the record to support them. The evidence shows that charge account *256 customers represented 1.9 percent of the total business of the Checker Cab Company in each of the years 1957 and 1958, while that of the Boynton Cab Company was 3.61 percent in 1957 and 2.59 percent in 1958. It is most probable, of course, that these percentages of charge customers to gross fares differed for each petitioner. Some of the petitioners testified that charge customers never tipped; one petitioner testified that they tipped occasionally; while another petitioner testified that one-fourth of the charge account passengers tipped. As to out-of-town passengers, about all we can glean from the record is that some of the petitioners occasionally had such passengers and that most of such passengers did not tip. We may agree that each petitioner has had passengers in these categories who sometimes tip and sometimes do not tip. But we cannot, on the meager evidence before us, find that the presence of nontippers among the passengers renders the 10 percent figure excessive. Petitioners overlook the fact that this figure is an average and does not purport to gauge with unerring accuracy each cab driver's tip income in 1957 and 1958. See , *257 affirming a Memorandum Opinion of this Court. Moreover, it appears that the respondent, in arriving at the average 10 percent tipping amount, considered the presence of non-tippers. A revenue agent who participated in the tipping survey testified, as follows: Q. Mr. Wdowczyk, isn't it a fact in your determination of ten per cent as the figure to be applied to the gross fares that in reaching the conclusion that ten per cent was a fair number, isn't it a fact that all factors were considered or all problems encountered by a cab driver in the course of his driving, all these factors were considered in reaching this number? A. That's right. I mean we are aware of certain facts where there either would be no tip at all, but everything was taken into consideration in reaching the final ten per cent figure. Q. Even things such as run outs and what have you? A. That's right. We hold for respondent. In the Rule 50 computations effect will be given to respondent's computations as set forth in footnote 3. Respondent determined additions to tax in the several dockets before us under section 6653(a), which provides for an addition to tax where an underpayment of income tax is due to *258 negligence. None of the petitioners here kept books or written records of their tips in either 1957 or 1958. In , this Court stated that a taxpayer who received tip income and failed to keep written records of the tips was "extremely negligent." In view of the complete absence of books and written records by the petitioners of their tip income and the substantial underreporting of such tips in 1957 and 1958, we sustain respondent's determination under section 6653(a). Decisions will be entered under Rule 50 in Docket Nos. 89477, 89598, 89610, 90132, 112-62, 587-62, 634-62 and 782-62. Decisions will be entered for the respondent in Docket Nos. 95435, 542-62, 783-62 and 784-62. Footnotes
1. The following proceedings are consolidated herewith: Edward E. Blenski and Janet Blenski, his wife, Docket No. 89598; Edward E. Blenski, Docket No. 89610; Robert De Meaux, Docket No. 90132; Martin Bines, Docket No. 95435; Frank Gillman and Lenore Gillman, his wife, Docket No. 112-62; Anthony Maglio and Lorelda Maglio, his wife, Docket No. 542-62; Donald Doggett and Grace Doggett, his wife, Docket No. 587-62; Morris Singer and Rose Singer, his wife, Docket No. 634-62; Stanley Tetzlaff and Helen Tetzlaff, his wife, Docket No. 782-62; Edwin C. Ihlenfeld, Docket No. 783-62; Edwin C. Ihlenfeld and Genevieve Ihlenfeld, his wife, Docket No. 784-62.↩
2. All section references will be to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
3. Respondent's brief shows the computed amounts of earned tip income, as follows: ↩
Petitioner
1957
1958
Hornburg
$623.40
$626.66
Blenski
556.60
335.82
De Meaux
925.53
862.31
Bines
516.40
524.34
Gillman
894.28
843.46
Maglio
668.17
800.43
Doggett
735.59
478.20
Singer
591.07
535.52
Tetzlaff
616.05
564.55
Ihlenfeld
260.00
264.00
4. Without departing from his argument for a 10 percent formula it is evident from footnote 3 that respondent has, on brief, conceded that the tip income of several of the petitioners is, in fact, less than 10 percent of gross fares, which stems no doubt in large part from respondent's reluctance to assume the burden of proof for what amounts to but a few dollars income.↩